**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| LEON RUBENSTEIN and SYLVIA RUBENSTEIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>MILLROSE PROPERTIES, INC., DARREN RICHMAN, and GARRETT ROSENBLUM,<br><br>Defendants. | Case No. |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF**
**THE FEDERAL SECURITIES LAWS**

Plaintiffs Leon Rubenstein and Sylvia Rubenstein ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Millrose Properties, Inc. ("Millrose" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Millrose; and (c) review of other publicly available information concerning Millrose.

## NATURE OF THE ACTION

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Millrose securities between February 7, 2025 and October 2, 2026, inclusive (the "Class

Period"). Plaintiffs pursue claims against the Defendants (defined below) under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Millrose is a "first-of-its-kind" homesite option purchase platform that was spun-off from Lennar Corporation ("Lennar") for the purpose of receiving the Business Assets from Lennar and becoming an independent publicly traded company.

3. Millrose engages in land purchases, horizontal development and homesite option purchase arrangements for Lennar and potentially other homebuilders and developers.

4. Prior to and throughout the Class Period, Millrose represented to investors that it "engages, through its subsidiaries, in land purchases, horizontal development and homesite option purchase arrangements, for Lennar, certain entities with which Lennar has a business relationship or in which Lennar has an ownership interest, and potentially other homebuilders and developers." Millrose further made clear to investors that Millrose does not "have any lease agreements" nor does it "intend to enter into any lease agreements in the foreseeable future."

5. Prior to and throughout the Class Period, Defendants failed to disclose to investors that: (i) despite representations to the contrary, Millrose's objectives were not limited to engaging in land purchases, horizontal development, and homesite option purchase arrangements for Lennar and potentially other homebuilders and developers; (ii) despite representations to the contrary, Millrose would in fact enter into lease agreements and would have tenants in its properties; (iii) Millrose would purchase $200 million worth of properties from Lennar; (iv) Millrose would lease the properties purchased from Lennar out at a loss; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6. The truth emerged on October 2, 2025 when Hunterbrook Media issued a report (the "Hunterbrook Report") revealing that, contrary to Millrose's earlier representations, Millrose purchased $200 million worth of finished homes from Lennar, an entity that controls Millrose, with the intent of leasing those properties on the rental market. In addition to leasing properties on the rental market, contrary to its earlier representations, Hunterbrook revealed that Millrose is making a loss on those rental properties.

7. On this news, Millrose's share price fell by $2.10, or 8.5%, from a close of $24.61 on October 2, 2026 to a close of $22.51 on October 5, 2026.

8. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

9. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

12. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

13. Plaintiff Leon Rubenstein, as set forth in the accompanying certification, incorporated by reference herein, purchased Millrose securities during the Class Period, and suffered significant losses as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14. Plaintiff Sylvia Rubenstein, as set forth in the accompanying certification, incorporated by reference herein, purchased Millrose securities during the Class Period, and suffered significant losses as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein

15. Defendant Millrose is incorporated under the laws of Maryland with its principal executive offices located in Miami, Florida. Millrose's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "MRP."

16. Defendant Darren L. Richman ("Richman") has served as the Company's Chief Executive Officer ("CEO") and President since February 7, 2025.

17. Defendant Garrett Rosenblum ("Rosenblum") has served as the Company's Chief Financial Officer ("CFO") and Treasurer since February 7, 2025.

18. Defendants Richman and Rosenblum (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities

analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

19. Millrose is a "first-of-its-kind" homesite option purchase platform that was spun-off from Lennar Corporation ("Lennar") for the purpose of receiving the Business Assets from Lennar and becoming an independent publicly traded company.

20. Millrose engages in land purchases, horizontal development and homesite option purchase arrangements for Lennar and potentially other homebuilders and developers.

21. At all relevant times prior to the Class Period, the Company clearly stated in its Draft Registration Statement and Amendments thereto:

> Property Use Objective with respect to the Transferred Assets are limited to (i) holding the Homesites until Lennar exercises its Purchase Options to purchase them in accordance with the terms of the Master Option Agreement, (ii) funding the Horizontal Development that Lennar will contractually be obligated to install with respect to any Homesites, up to a certain pre-agreed budget, in accordance with the terms of the Master Construction Agreement that forms a part of the Master Program Agreement, and (iii) to the extent applicable and requested by Lennar, facilitating any Lennar sales of completed homes by delivering the home and Homesite directly to home buyers to which Lennar has sold the homes. For the avoidance of doubt, Millrose Holdings' Property Use Objective with respect to the Transferred Assets does not include (i) performing or funding any home construction on any properties, (ii) performing (directly or through contracted third

> parties) any Horizontal Development on any properties other than through Lennar, or (iii) entering into any leases or other use/occupancy-related arrangements with respect to any properties. However, Lennar may decide not to exercise or forfeit its Purchase Options with respect to any Homesites as further described under "Our Business—Summary of Operational Agreements," in which case these restrictions would not apply to properties that are no longer subject to Lennar Purchase Options.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

22. The Class Period begins on February 7, 2025, the day the spin-off became effective and Millrose debuted on the NYSE. On that date, the Company issued a press release which was attached to a Form 8-K filing with the SEC. That press release stated the following, in relevant part:

> Millrose engages in land purchases, horizontal development and homesite option purchase arrangements for Lennar and potentially other homebuilders and developers.
>
> ***
>
> Darren Richman, Chief Executive Officer and President of Millrose Properties, Inc., said, "We are excited to operate Millrose in its mission to facilitate the creation of high-quality residential communities by leveraging our financial expertise and industry relationships. Given our already existing robust backlog of industry assets, we expect to immediately begin the process of executing and closing accretive third-party deals."
>
> ***
>
> **About Millrose**
>
> Millrose is an independent, publicly traded company that engages, through its subsidiaries, in land purchases, horizontal development and homesite option purchase arrangements, for Lennar, certain entities with which Lennar has a business relationship or in which Lennar has an ownership interest, and potentially other homebuilders and developers.

23. On February 24, 2025, the Company presented at the J.P. Morgan Global High Yield & Leveraged Finance Conference. The presentation prepared for that conference contained the following information, in relevant part:


Millrose's Simple Business Model Efficiently Recycles Capital
Land Identified
Land selected and vetted by homebuilder
Land Purchased
Millrose purchases land
Homebuilder pays deposit and monthly option fee
Homesite Developed
Millrose funds homebuilder land development into finished homesite
Homesite Delivered
Homebuilder purchases homesites from Millrose
Proceeds Recycled
Millrose recycles cash proceeds to fund acquisitions and land development
Illustrative Millrose Transaction
Timeline
Millrose purchases land
Homesite development
Homesite delivery
Millrose redeploys capital into new projects
Invested Capital
Millrose funds land development
Millrose receives takedown proceeds
Takedown proceeds = land purchase + development investment¹
Income
Millrose receives recurring option payment on Invested Capital balance
Option payment charged on capital balance in each month
MILLROSE
PROPERTIES
1.Land purchase net of deposit funded by builder
For Institutional Use Only
7

***




24. On March 14, 2025, the Company filed a Registration Statement on Form S-8 with the SEC, which was signed by the Individual Defendants. That Registration Statement expressly incorporated by reference the Company's prospectus, dated January 17, 2025, which stated, in relevant part:

> ***Leases and Occupancy***
>
> In accordance with the Master Option Agreement, we expect to sell the Homesites included in the Transferred Assets and the Supplemental Transferred Assets to Lennar upon Lennar's exercise of its exclusive Purchase Options prior to or when completion of the Work on the completed Homesites is approaching, and that Lennar will work on the home construction at its option in accordance with the terms of the Master Option Agreement. The Lennar Agreements obligate Lennar to complete Horizontal Development and gives Lennar the option to undertake home construction on the Homesites while we (through Millrose Holdings) own the Homesites. ***We do not, and will not, have any lease agreements with respect to the Transferred Assets and the Supplemental Transferred Assets, do not intend to***

> ***enter into any lease agreements in the foreseeable future and do not, and will not, have any tenants or occupants on any of the properties in the Real Estate Portfolio*. *Furthermore, we do not expect leases and occupancy to be within the scope of our Property Use Objective for the foreseeable future***. See "Our Business—Summary of Operational Agreements."

(Emphasis added).

25. On March 31, 2025, the Company filed its Annual Report on Form 10-K with the SEC, which was signed by the Individual Defendants. The Form 10-K stated the following, in relevant part:

> *Leases and Occupancy*
>
> In accordance with the Master Option Agreement, we expect to sell the Homesites included in the Transferred Assets and the Supplemental Transferred Assets to Lennar upon Lennar's exercise of its exclusive Purchase Options prior to or when completion of the Work on the completed Homesites is approaching, and that Lennar will work on the home construction at its option in accordance with the terms of the Master Option Agreement. The Lennar Agreements obligate Lennar to complete Horizontal Development and gives Lennar the option to undertake home construction on the Homesites while we (through Millrose Holdings) own the Homesites. ***We do not, and will not, have any lease agreements with respect to the Transferred Assets and the Supplemental Transferred Assets, do not intend to enter into any lease agreements in the foreseeable future and do not, and will not, have any tenants or occupants on any of the properties in the Real Estate Portfolio. Furthermore, we do not expect leases and occupancy to be within the scope of our Property Use Objective for the foreseeable future***. "Part III, Item 13. Certain Relationships and Related Transactions, and Director Independence—Transactions with Lennar."

(Emphasis added).

26. On May 24, 2025, the Company filed its Quarterly Report on Form 10-Q with the SEC, which was signed by Defendant Rosenblum. In that filing, the Company once again stated that it "purchases and develops residential land and sells finished homesites back to homebuilders…"

27. On July 31, 2025, the Company filed its Quarterly Report on Form 10-Q with the SEC, which was signed by Defendant Rosenblum. In that filing, the Company repeated the same statement as contained in its May 2025 Form 10-Q, above.

28. On September 3, 2025, the Company filed with the SEC a Draft Registration Statement, signed by the Individual Defendants. In relevant part, that Draft Registration Statement stated the following:

> ***Leases and Occupancy***
>
> In accordance with the Master Option Agreement and Other Agreements, we expect to sell the Homesites to home builders upon their exercise of their purchase options prior to or when completion of the work on the completed Homesites is approaching, and that home builders will work on the home construction at their option in accordance with the terms of the Master Option Agreement and Other Agreements. The Lennar Agreements and Other Agreements obligate home builders to complete Horizontal Development and give home builders the option to undertake home construction on the Homesites while we own the Homesites. ***We do not, and will not, have any lease agreements with respect to our property assets, do not intend to enter into any lease agreements in the foreseeable future and do not, and will not, have any tenants or occupants on any of the properties in the Real Estate Portfolio. Furthermore, we do not expect leases and occupancy to be within the scope of our Property Use Objective for the foreseeable future***. See "Agreements Between Lennar and Millrose and Other Related Party Transactions—Transactions with Lennar."

(Emphasis added).

29. On October 10, 2025, the Company filed a Registration Statement on Form S-4 with the SEC, signed by the Individual Defendants. The Registration Statement contained the following information, in relevant part:

> ***Leases and Occupancy***
>
> In accordance with the Master Option Agreement and Other Agreements, we expect to sell the Homesites to home builders upon their exercise of their purchase options prior to or when completion of the work on the completed Homesites is approaching, and that home builders will work on the home construction at their option in accordance with the terms of the Master Option Agreement and Other Agreements. The Lennar Agreements and Other Agreements obligate home

> builders to complete Horizontal Development and give home builders the option to undertake home construction on the Homesites while we own the Homesites. ***We do not, and will not, have any lease agreements with respect to our property assets, do not intend to enter into any lease agreements in the foreseeable future and do not, and will not, have any tenants or occupants on any of the properties in the Real Estate Portfolio. Furthermore, we do not expect leases and occupancy to be within the scope of our Property Use Objective for the foreseeable future***. See "Agreements Between Lennar and Millrose and Other Related Party Transactions—Transactions with Lennar."

(Emphasis added).

30. On October 24, 2025, the Company filed an amendment to the Registration Statement on Form S-4/A with the SEC, signed by the Individual Defendants. The Amendment contained the same information as the October 10, 2025 Registration Statement referenced above.

31. In an investor presentation prepared in connection with the Registration Statement, the Company shared the following information with investors:


Millrose's Homesite Option Purchase Platform ("HOPP'R") is Designed to Efficiently Recycle Capital
Land Identified
Land selected and vetted by homebuilder
Millrose independent diligence
Land Purchased
Millrose purchases land
Homebuilder pays deposit and monthly option fee
Homesite Developed
Millrose funds homebuilder land development into finished homesite
Homesite Delivered
Homebuilder purchases homesites from Millrose
Proceeds Recycled
Millrose recycles cash proceeds to fund acquisitions and land development
Illustrative Millrose Transaction
Millrose purchases land
Timeline
Homesite development
Homesite delivery
Millrose redeploys capital into new projects
Invested Capital
Millrose funds land development
Millrose receives takedown proceeds
Takedown proceeds = land purchase + development investment¹
Income
Millrose receives recurring option payment on Invested Capital balance
Option payment charged on capital balance in each month
1. Land purchase net of deposit funded by builder.
MILLROSE
PROPERTIES
For Institutional Use Only

***




32. Amendments to the Registration Statement filed on November 5, 10, and 14, 2025 all contained the same statement that was in the Registration Statement and first Amendment, referenced above.

33. On November 19, 2025, the Company filed its Prospectus with the SEC. That Prospectus contained the following information:

> ***Leases and Occupancy***
>
> In accordance with the Master Option Agreement and Other Agreements, we expect to sell the Homesites to home builders upon their exercise of their purchase options prior to or when completion of the work on the completed Homesites is approaching, and that home builders will work on the home construction at their option in accordance with the terms of the Master Option Agreement and Other Agreements. The Lennar Agreements and Other Agreements obligate home builders to complete Horizontal Development and give home builders the option to undertake home construction on the Homesites while we own the Homesites. ***We***

> ***do not, and will not, have any lease agreements with respect to our property assets, do not intend to enter into any lease agreements in the foreseeable future and do not, and will not, have any tenants or occupants on any of the properties in the Real Estate Portfolio. Furthermore, we do not expect leases and occupancy to be within the scope of our Property Use Objective for the foreseeable future***. See "Agreements Between Lennar and Millrose and Other Related Party Transactions—Transactions with Lennar."

(Emphasis added).

34. On February 27, 2026, the Company filed its Annual Report on Form 10-K with the SEC, which was signed by the Individual Defendants. The Annual Report contained the following information, in relevant part:

> We hold homesite properties in connection with our land banking operations throughout the United States, the locations of which are summarized under "Part I. Item 1. Business—Our Objectives and Strategies —Portfolio Overview". These properties are owned and sold to homebuilders upon exercise of their purchase options under option contracts. ***We generally do not enter into occupancy arrangements with builders or allow tenants on our homesite properties***.

(Emphasis added).

35. The above statements identified in ¶¶ 22-34 were materially false and/or misleading and/or failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (i) despite representations to the contrary, Millrose's objectives were not limited to engaging in land purchases, horizontal development, and homesite option purchase arrangements for Lennar and potentially other homebuilders and developers; (ii) despite representations to the contrary, Millrose would in fact enter into lease agreements and would have tenants in its properties; (iii) Millrose would purchase $200 million worth of properties from Lennar; (iv) Millrose would lease the properties purchased from Lennar out at a loss; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

36. On October 2, 2026, Hunterbrook issued the Hunterbrook Report which revealed that: "The nation's second-largest homebuilder is struggling to sell houses. So it found a buyer it previously owned: Millrose Properties, which gets most of its revenue from Lennar and counts Lennar's CEO as its largest voting shareholder. Contrary to the plans in its initial SEC filings, Millrose has now bought an estimated $200 million of Lennar homes in about a month and is renting them out at what appears to be a loss."

37. The Hunterbrook Report stated the following, in relevant part:

- Lennar ($LEN) found a big buyer for its houses: the spinoff Millrose ($MRP) it created to hold its land last year. Now Millrose is buying Lennar's finished homes: Hunterbrook identified more than 700 purchases across at least 51 counties in 15 states — an estimated $200 million or more in about a month. Sustained for a quarter, that pace would equal about a tenth of Lennar's latest quarterly deliveries and over 7% of its home sales revenue. In the last month, Millrose already appears to have become the largest buyer of Lennar houses that Hunterbrook has identified. A Lennar homeowner in a subdivision where Millrose is buying up homes put it bluntly: "Why are you buying your own homes? Aren't you supposed to be selling these?"

- The purchases arrived just when Lennar needed them. Hunterbrook identified at least 356 Millrose purchases in the final week of Lennar's fiscal quarter. Lennar beat the bottom of its delivery forecast by just 340 homes — the only one of five homebuilding targets it met. These sales were the difference between meeting and missing the forecast.

- Millrose told investors it wouldn't be a landlord. Now it's renting out Lennar's houses. Homebuilders need land to build on. To lighten its balance sheet, Lennar moved much of its land into Millrose in 2025. Lennar pays Millrose a fee for the right to buy the lots back, one at a time, when it's ready to build. Millrose's role was clear: It would own the lots, not rent out houses on them. Millrose's annual report said it would not "have any tenants or occupants" on its properties. In August, Millrose changed its agreements to let it buy Lennar's finished homes and rent them out.

- Millrose appears to earn less on these houses than it pays to borrow. Hunterbrook compared purchase prices in county records with advertised rents on Zillow. After estimated property expenses, the homes would return about 5% a year, before

interest and corporate costs. Millrose's latest bond offering carries interest rates of 6.5% to 6.75% — more than those estimated rental returns.

- Millrose appears to be paying more for these homes than individual buyers and at least one other institution. Millrose paid about 13% more than individual buyers in the same communities, according to Hunterbrook's analysis, after accounting for the roughly 12% in incentives Lennar says individual buyers received on average. Millrose also paid about 5% more than KKR-linked Slate, another bulk buyer of Lennar homes, in the same communities. Differences between the houses, and incentives absent from public records, could affect the comparisons. But the records offer little evidence that Millrose bought at a discount that would make its rentals more profitable.

- These purchases come as Lennar barely generates cash. Lennar reported about $2.1 billion in profit in fiscal 2025 but just $28 million in free cash flow, the cash leftover after paying to run and invest in the business. That's despite cutting its building costs — and, allegedly, its quality. Hunterbrook's earlier "House from Hell" investigation documented corner-cutting and serious construction defects, later echoed by the Wall Street Journal. One steady drain on Lennar's cash is Millrose: Lennar pays it about $43 million a month to hold land, according to Millrose's most recent report. Those payments continue until Lennar buys the lots or walks away from them, which would mean taking impairments on investments it has already made.

- Why would Millrose help Lennar? It depends on Lennar's payments. As a real estate investment trust (REIT), Millrose must pay out at least 90% of all its taxable income. Lennar supplied 72% of Millrose's revenue last quarter. Millrose lacks independent capacity: It has no employees and relies on an outside manager, selected by Lennar. Lennar CEO Stuart Miller also holds approximately 43% of Millrose's voting power. Helping Lennar sell houses could protect Millrose's biggest customer and voting shareholder. Millrose's own filings warn that its agreements with Lennar weren't negotiated at arm's length and "may be considered more favorable to Lennar."

- Accounting rules say a company cannot book a sale to an entity it controls; a forensic accountant told Hunterbrook the question of Lennar's control over Millrose seems "black and white" in spirit, if not technically. Lennar says it lacks "the power" to direct Millrose, but "Millrose seems to be acting against their own best interest," according to JP Krahel, chair of Loyola University Maryland's accounting department. John McPherson, a forensic accountant whose tip helped bring a successful SEC enforcement action, told Hunterbrook, "This is a tripwire that takes us from a gray zone to black and white."

- Lennar could not be reached for comment; Millrose did not provide a comment in response to Hunterbrook's questions. When reached ahead of a prior Hunterbrook article, Lennar issued an 8-K proactively disputing certain issues.

It's a round trip that would make Jensen Huang blush.

Lennar, the nation's second-largest homebuilder, has found a big new buyer for its homes: Millrose Properties, the company it spun off last year, whose largest voting shareholder is Lennar's own CEO, Stuart Miller.

In the last week of August, the final days of its fiscal quarter, Lennar sold at least 356 homes to Millrose, according to Hunterbrook's review of property records. That may not sound like a lot for a company that delivers more than 20,000 homes a quarter. But it was just enough.

When Lennar reported third-quarter results on September 16, it fell short of four of the five homebuilding targets it had given investors: orders, price, margin and overhead. The one it hit was deliveries. Lennar had forecast at least 20,500 and reported 20,840, a cushion of 340 homes. Without the sales to Millrose, it would have missed that target, too.

***

The sales continued. By the end of September, Lennar had sold more than 700 Lennar homes to Millrose across at least 51 counties in 15 states — roughly $200 million in about a month[] — Hunterbrook found. The search is ongoing, and the national total could be higher. If that pace held for a full quarter, Millrose would buy approximately 2,100 homes for $588 million to $630 million. That's equivalent to about a tenth of Lennar's latest quarterly deliveries and over 7% of its home sales revenue.

***

That flips the relationship. Since spinning Millrose off in 2025, Lennar has been its biggest customer, paying Millrose hundreds of millions of dollars a year for the right to buy its land. Now, suddenly, Millrose has become a major customer of Lennar's, too.

Peter, meet Paul. Paul, meet Peter.

In a striking example of the round trip, deed records in Marion County, Florida, show that Lennar:

- Transferred ownership of land to Millrose, a "wholly owned subsidiary of the same owner," in August 2024;

- Bought back the land at roughly $49,500 per lot in 2025 and 2026 in order to build homes;

- Sold the houses for the average price of $244,351 to Millrose's subsidiary, MRP Liberty, in September.



GENERAL WARRANTY DEED

**THIS GENERAL WARRANTY DEED** ("Deed") is made and executed as of the 8 day of August, 2024 by **LENNAR HOMES, LLC**, a Florida limited liability company ("Grantor"), whose address is 5505 Waterford District Drive, 5th Floor, Miami, Florida 32126 to **MILLROSE PROPERTIES FLORIDA, LLC**, a Florida limited liability company ("Grantee"), whose address is 5505 Waterford District Drive, 5th Floor, Miami, Florida 32126.

**SPECIAL WARRANTY DEED**

DATE: July 17, 2026

FOR VALUABLE CONSIDERATION, Millrose Properties Florida, LLC, a Florida limited liability company (hereinafter called the "**Grantor**") whose address is 600 Brickell, Suite 1400, Miami, FL 33131, hereby conveys and quitclaims to Lennar Homes, LLC, a Florida limited liability company (hereinafter called the "**Grantee**") whose address is 4414 SW College Rd., Ste 922, Ocala, FL 34474, real property in Marion County, Florida, legally described on **Exhibit "A"** attached hereto (the "Property"):.

**SPECIAL WARRANTY DEED**

THIS SPECIAL WARRANTY DEED (this "**Deed**") is made as of the 28th day of August, 2026, by and between Lennar Homes, LLC, a Florida limited liability company ("**Grantor**") having a mailing address of 4414 SW College Rd., Ste 922, Ocala, FL 34474, and MRP Liberty, LLC, a Delaware limited liability company ("**Grantee**") whose mailing address is 1999 Bryan St., Suite 1200, Dallas, TX 75201.



It wasn't supposed to be this way.

Millrose was designed as a land bank: a company that owns land so a homebuilder doesn't have to carry its real estate on its books. At its founding, Lennar handed Millrose about $5.5 billion of land, roughly 87,000 homesites, and $1 billion in cash. Lennar pays Millrose option fees, initially set at 8.5% a year, that let it buy the land back lot by lot as it's ready to build. Lennar then builds the houses and sells them. A clear division of labor.

Millrose's filings were explicit about that. In its inaugural 10-K filed in 2025, the company said it did "not, and will not, have any tenants or occupants on any of the properties" in its real estate portfolio. Its properties were for holding land until Lennar bought it and for financing development work. "For the avoidance of doubt," the filing added, those uses did not include "entering into any leases."

Then, on August 27 of this year, Millrose and three Lennar subsidiaries signed an amendment to their Founder's Rights Agreement.

The companies added a new category of assets: "completed single family homes." The disclosure stated that Millrose would buy these homes and then operate them as rentals, exactly what the land bank had said it wouldn't do in its initial SEC filings. "What you often find with these things is they find other uses for the

structure once they have it set up, as things evolve," said John McPherson, a forensic accountant, referring to Lennar spinning out Millrose.

The same day, Millrose amended its management agreement to permit rental homes and to make Millrose, rather than its manager Kennedy Lewis, pay their operating expenses. Millrose disclosed both updates in exhibits to an 8-K dated September 1.

b. Exhibit B, Section 5 of the Agreement is hereby amended and restated in its entirety to read as follows:

Invest in real estate assets with a primary planned use as homesites for single-family detached and/or attached homes, including without limitation single family homes to be held and operated as rental properties pursuant to an approved single family home rental strategy.

By the time the new agreements were signed, the buying had already begun.

An Arizona deed dated August 21, six days before the amendments were signed, identifies MRP Liberty LLC as the buyer of a single family home in Buckeye, Arizona, for approximately $1 million. The name doesn't say who is behind the buyer. Its Florida corporate registration does: MRP Liberty's sole member is Millrose Properties.

APPLICATION BY FOREIGN LIMITED LIABILITY COMPANY FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA

*IN COMPLIANCE WITH SECTION 605.0902, FLORIDA STATUTES THE FOLLOWING IS SUBMITTED TO REGISTER A FOREIGN LIMITED LIABILITY COMPANY TO TRANSACT BUSINESS IN THE STATE OF FLORIDA:*

1. MRP LIBERTY, LLC
(Name of Foreign Limited Liability Company; must include "Limited Liability Company," "L.L.C.," or "LLC.")

(If name unavailable, enter alternate name adopted for the purpose of transacting business in Florida. The alternate name must include "Limited Liability Company," "L.L.C." or "LLC.")

2. Delaware
(Jurisdiction under the law of which foreign limited liability company is organized)

3. 39-2273757
(FEI number, if applicable)

8. For initial indexing purposes, list names, title or capacity and addresses of the primary members/managers or persons authorized to manage [up to six (6) total]:

| Title or Capacity: | Name and Address: | Title or Capacity: | Name and Address: |
|---|---|---|---|
| ☐Manager | Name: Millrose Properties, Inc. | ☐Manager | Name: |
| ■Member | Address: 600 Brickell Ave | ☐Member | Address: |
| ☐Authorized | Suite 1400 | ☐Authorized | |
| Person | Miami, Florida 33131 | Person | |
| ☐Other | ☐Other | ☐Other | ☐Other |

HNTR BRK

It was one of several hundred sales to MRP Liberty that helped boost the deliveries Lennar reported in its September 16 earnings release, though the homebuilder did not publicly identify Millrose as a buyer of its homes.

***

**Millrose's New Bet**

The arrangement is visible, though, on Feaster Drive in Wesley Chapel, Florida, where finished houses stand alongside homes still under construction in a Lennar development.

At house number 9828, the garage stood open when a Hunterbrook reporter visited. A man emerging from the house said he worked for a property manager and had been cleaning inside, and that the house was for rent. He loaded his equipment into a white van marked "Homes for Lease."




The house was listed by Lennar for sale in April at $490,990, according to Zillow. By August, the asking price had dropped to $420,490. The listing was removed on August 14.

Pasco County deed records show that MRP Liberty, a Millrose subsidiary, bought the house in August for $409,300. It is now listed for rent at $2,825 a month.

It's a head-scratching purchase.

If the house rents at the advertised price, Millrose would generate about $33,900 in annual rent on its $409,300 purchase. But Millrose only takes home about $3,100 per year after property taxes, insurance, and financing costs, according to Hunterbrook's estimates, which assume Millrose borrowed at the approximate 5.5% rate on its revolving credit line. That's a return of less than 1% — before HOA dues, maintenance, or vacancies.

The Pasco County house isn't an outlier. Across the Millrose-owned homes Hunterbrook found listed for rent on Zillow, Millrose would earn little or nothing once expenses and borrowing costs are counted, based on Hunterbrook's calculation.

***

**Millrose's New Landlord Business: More Responsibilities, Less Income**

Millrose discussed its rental-home program in a call summarized in a September 30 Goldman Sachs note to clients. Management described a small rent-to-own pilot for prospective buyers who cannot qualify for mortgages.

Under the proposed model, Millrose would buy homes with signed leases already in place and credit part of tenants' payments toward an eventual purchase. Management said builder discounts and eventual home sales should produce returns comparable to or better than land banking. It also said the initiative originated inside Millrose, rather than with a builder, and that no asset management fee was currently charged on these homes.

If tenants did not ultimately buy, Millrose would sell the properties on the open market — with no right to return them to the builder.

Here's what Hunterbrook found.

Millrose's main land deal with Lennar yielded a weighted average of 8.5% a year as of June, before corporate expenses and financing costs. Its land banking deals with other customers yield even higher returns, according to the company.

The finished home purchases Millrose is now making, on the other hand, offer worse returns, according to Hunterbrook's calculations.

On the surface, the numbers seem fine: The rent Millrose is asking for on Zillow adds up to about 8.4% of what it paid for the homes each year, according to Hunterbrook's review of county deeds and Zillow rental listings for the homes Millrose purchased. That aligns with Millrose telling Goldman Sachs it has similar returns to its existing land banking business. But that's not the full story.

8.4% is the gross yield. Out of that, a landlord must pay property taxes, insurance, HOA fees, repairs and management fees— which together add up to roughly 40% of the gross rent, based on Hunterbrook's review of margins disclosed at comparable businesses.

That leaves about a 5% annual return.

And that's before factoring in Millrose's cost of capital. On September 22, Millrose priced new bonds at interest rates of 6.5% and 6.75%. The bonds don't appear to be directly tied to these houses, but borrowing at those rates to buy homes yielding about 5% doesn't appear to be a money-making proposition.

Other landlords have declined to make this trade.

***

**Lennar's Hold on Millrose**

Millrose and Lennar are technically separate companies, but they share the same DNA.

In addition to Lennar being Millrose's largest customer — and Lennar CEO Miller being Millrose's largest voting shareholder, with 43% of the votes — Lennar's influence also runs through Kennedy Lewis, which has had a long, close relationship with the homebuilder. Lennar picked Kennedy Lewis for the job of managing Millrose, and the ties between Kennedy Lewis co-founder Darren Richman and Lennar go back two decades.

Richman, now the CEO of Millrose, once covered Lennar as a high-yield credit research analyst at Goldman Sachs. In 2021, Lennar and Kennedy Lewis began a land-banking partnership that Millrose's investor presentation called a "deep-rooted relationship highlighted by their completion of $4.5B+ of land-banking transactions since 2022."

Kennedy Lewis also served as Lennar's unpaid strategic adviser on the structure, formation, and contracts of the Millrose spinoff. According to Millrose's prospectus, "Lennar did not engage in a competitive selection process to evaluate KL against other potential manager candidates, including managers with relevant experience in managing public companies."

Millrose has a separate board, whose directors it identifies as independent. But its policies give standing preapproval to the Lennar agreements and the transactions they contemplate. And the August 27 amendment permitting the rentals refers to an "approved single family home rental strategy."

The filing does not say who, exactly, was behind that approval.

Asked for any more detail on the discussions between Lennar and Millrose, neither company provided a comment.

But Millrose itself has warned investors about potential conflicts of interest.

> Because it had "no independent management or personnel before the spinoff," its agreements with Lennar "have not been done at arm's length," the company disclosed to the SEC, and "there can be no assurance that Lennar negotiated the Management Agreement with Millrose's best interests in mind."
>
> The terms, it said, "may be considered more favorable to Lennar than if Lennar had negotiated with a third-party land bank."
>
> And that was before Millrose started buying Lennar's homes.

38. On this news, Millrose's share price fell by $2.10, or 8.5%, from a close of $24.61 on October 2, 2026 to a close of $22.51 on October 5, 2026

39. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

40. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Millrose securities between February 7, 2025 and October 2, 2026, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

41. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Millrose's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Millrose shares were traded publicly

during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Millrose or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

43. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

44. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Millrose; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

45. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

46. The market for Millrose's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Millrose's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Millrose's securities relying upon the integrity of the market price of the Company's securities and market information relating to Millrose and have been damaged thereby.

47. During the Class Period, Defendants by words or deeds materially misled the investing public, thereby inflating the price of Millrose's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Millrose's business, operations, and prospects as alleged herein.

48. At all relevant times, the material misrepresentations and omissions, and deceptive actions, particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Millrose's financial well-being and prospects, or approved deceptive actions. These material misstatements and/or omissions and deceptive actions had the cause and effect of creating in the market an unrealistically positive assessment of

the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements or deceptive actions during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

49. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

50. During the Class Period, Plaintiffs and the Class purchased Millrose's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

51. As alleged herein, Defendants acted with scienter since Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws, or knowingly or recklessly engaged in deceptive conduct. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Millrose, their control over, and/or receipt and/or modification of Millrose's allegedly materially misleading

misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Millrose, participated in the fraudulent scheme alleged herein.

52. As noted herein, Millrose is substantially controlled by Lennar, with Lennar's CEO—Stuart Miller—owning 43% of the voting power of Millrose. As the Hunterbrook Report revealed, the self-interested transaction between Millrose and Lennar came at a time when Lennar's third-quarter net earnings fell by 51% compared to the same quarter last year. Home sales revenue fell 6%, new orders dropped 9%, and the average selling price slipped to $372,000 as incentives averaged about 12% of purchase price.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

53. The market for Millrose's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Millrose's securities traded at artificially inflated prices during the Class Period. On August 28, 2025, the Company's share price closed at a Class Period high of $35.50 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Millrose's securities and market information relating to Millrose and have been damaged thereby.

54. During the Class Period, the artificial inflation of Millrose's shares was caused by the material misrepresentations and/or omissions or deceptive conduct particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Millrose's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Millrose and its business, operations, and prospects, thus causing the price of the Company's

securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements and scheme to prop up the Company's stock and defraud the market during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

55. At all relevant times, the market for Millrose's securities was an efficient market for the following reasons, among others:

(a) Millrose shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Millrose filed periodic public reports with the SEC and/or the NYSE;

(c) Millrose regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Millrose was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

56. As a result of the foregoing, the market for Millrose's securities promptly digested current information regarding Millrose from all publicly available sources and reflected such information in Millrose's share price. Under these circumstances, all purchasers of Millrose's

securities during the Class Period suffered similar injury through their purchase of Millrose's securities at artificially inflated prices and a presumption of reliance applies.

57. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**NO SAFE HARBOR**

58. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker

had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Millrose who knew that the statement was false when made.

**FIRST CAUSE OF ACTION**

**Against Defendants for Violations of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder**

59. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

60. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Millrose's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct each defendant took the actions set forth herein.

61. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Millrose's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

62. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about Millrose's financial well-being and prospects, as specified herein.

63. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Millrose's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Millrose and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

64. Defendants' primary liability and controlling person liability arises from the following facts: (i) the Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

65. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Millrose's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

66. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Millrose's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Millrose's securities during the Class Period at artificially high prices and were damaged thereby.

67. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Millrose's

business and operations, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Millrose securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

68. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CAUSE OF ACTION

### Against the Individual Defendants for Violations of Section 20(a) of The Exchange Act

70. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

71. Individual Defendants acted as controlling persons of Millrose within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements

alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

73. As set forth above, Millrose and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: October 9, 2026

*/s/ Joshua H. Eggnatz*
Joshua H. Eggnatz, Esq.
Fla. Bar No.: 0067926
**EGGNATZ | PASCUCCI**
7450 Griffin Rd, Ste. 230
Davie, FL 33314
Telephone: (954) 889-3359
Facsimile: (954) 889-5913
Email: JEggnatz@JusticeEarned.com
Sgizzie@JusticeEarned.com

*Local Counsel for Plaintiffs*

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
Christopher M. Brain
260 Madison Ave., 22nd Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com
Email: cbrain@gme-law.com

*Lead Counsel for Plaintiffs*

## CERTIFICATION OF NAMED PLAINTIFF

I, Leon Rubenstein ("Plaintiff") hereby retain the Gainey McKenna & Egleston and such co-counsel it deems appropriate to associate with, subject to their investigation, to pursue my claims on a contingent fee basis and for counsel to advance the costs of the case, with no attorneys fee owing except as may be awarded by the court at the conclusion of the matter and paid out of any recovery obtained and I also hereby declare the following as to the claims asserted under the law that:

Plaintiff reviewed the complaint to be filed in this matter and authorized the filing of a complaint based on similar allegations in a related or amended complaint.

Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

Plaintiff's transactions in ***Millrose Properties, Inc. ("MRP")*** securities that are the subject of this action during the Class Period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 500 | MRP | Buy | 06/15/26 | $29.33 |
| | | | | |
| | | | | |

**Please list other transactions on a separate sheet of paper, if necessary.**

Plaintiff has sought to serve as a class representative in the following cases within the last three years: NONE.

Plaintiff has complete investment authority and is the agent and attorney-in-fact with full power and authority to bring suit to recover for investment losses.

Plaintiff will not accept any payment serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8 day of OCTOBER, 2026

[signature]
Signature

Leon Rubenstein
Print Name

[redacted]
E-mail

[redacted]
Other telephone numbers

[redacted]
Address

[redacted]
City, State, Zip

[redacted]
Phone

## CERTIFICATION OF NAMED PLAINTIFF

I, Sylvia Rubenstein ("Plaintiff") hereby retain the Gainey McKenna & Egleston and such co-counsel it deems appropriate to associate with, subject to their investigation, to pursue my claims on a contingent fee basis and for counsel to advance the costs of the case, with no attorneys fee owing except as may be awarded by the court at the conclusion of the matter and paid out of any recovery obtained and I also hereby declare the following as to the claims asserted under the law that:

Plaintiff reviewed the complaint to be filed in this matter and authorized the filing of a complaint based on similar allegations in a related or amended complaint.

Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

Plaintiff's transactions in ***Millrose Properties, Inc. ("MRP")*** securities that are the subject of this action during the Class Period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 1000 | MRP | Buy | 08/30/26 | $26.09 |
| | | | | |
| | | | | |

**Please list other transactions on a separate sheet of paper, if necessary.**

Plaintiff has sought to serve as a class representative in the following cases within the last three years: NONE.

Plaintiff has complete investment authority and is the agent and attorney-in-fact with full power and authority to bring suit to recover for investment losses.

Plaintiff will not accept any payment serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8 day of OCTOBER, 2026

Sylvia Rubenstein
Signature

[redacted]
Address

Sylvia Rubenstein
Print Name

[redacted]
City, State, Zip

[redacted]
E-mail

[redacted]
Phone